IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

CHARLES T. HERRMANN                                                   PLAINTIFF

V.                                            CIVIL ACTION NO. 3:17-cv-110-DAS

COMMISSIONER OF SOCIAL SECURITY                              DEFENDANT

MEMORANDUM OPINION

Charles T. Herrmann has appealed the decision of the Social Security Administration denying his application for benefits. The Administrative Law Judge determined that Herrmann's degenerative lumbar disc disease, mood disorder, and history of alcohol abuse were severe impairments, but that he was able to perform a full range of unskilled medium work. Though the ALJ found that Herrmann was suffering from severe nonexertional impairments, rather than relying on a vocational expert, the ALJ determined at Step Five that Herrmann was not disabled pursuant to the Medical-Vocational guidelines. Claimant asserts multiple errors in the decision.

STANDARD OF REVIEW

A claimant has the burden of proving he suffers from a disability, which the Social Security Act defines as a mental or physical impairment, lasting at least a year, which precludes him from substantial gainful activity. The relevant analysis proceeds in five steps: the Commissioner considers whether (1) the claimant is currently engaged in substantial gainful activity, (2) he has a severe impairment, (3) the impairment meets the severity of an impairment enumerated in the relevant regulations, (4) it prevents the claimant from performing past relevant work, and (5) it prevents him from doing any relevant work. 20 C.F.R. § 404.1520; *Masterson v. Barnhart,* 309 F.3d 267, 271 (5th Cir. 2002). If the claimant survives the first four stages, the burden shifts to the Commissioner on the fifth step to prove the claimant's employability. *Perez v. Barnhart*, 415 F.3d

457, 461 (5th Cir. 2005). A finding at any step that the claimant is not disabled ends the inquiry. *Chaparro v. Bowen*, 815 F.2d 1009, 1010 (5th Cir. 1987).

This court's review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Substantial evidence has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401 (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)). The Fifth Circuit has further held that substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988) (quoting *Hames v. Heckler*, 707 F.2d 162, 164(5th Cir. 1983)). Conflicts in the evidence are for the Commissioner to decide, and if substantial evidence is found to support the decision, the decision must be affirmed even if there is evidence on the other side. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990). The court may not reweigh the evidence, try the case *de novo*, or substitute its own judgment for that of the Commissioner even if it finds that the evidence preponderates against the Commissioner's decision. *Bowling v. Shalala*, 36 F.3d 431, 434(5th Cir. 1994); *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Harrell*, 862 F.2d at 475. The court must, however, in spite of its limited role, "scrutinize the record in its entirety to determine the reasonableness of the decision . . . and whether substantial evidence exists to support it." *Randall v. Sullivan,* 956 F.2d 105, 109 (5th Cir. 1992). If the Commissioner's decision is

supported by the evidence, then it is conclusive and must be upheld. *Paul v. Shalala*, 29 F.3d 208, 210 (5th Cir. 1994).

THE ALJ'S DECISION

In denying benefits, the ALJ found that claimant had not engaged in substantial gainful activity since May 21, 2014, the amended alleged onset date of disability. At Step Two, the ALJ found Herrmann's degenerative lumbar disc disease, mood disorder, and history of alcohol abuse[1] were severe impairments.

The ALJ found that Herrmann had the residual functional capacity to perform a full range of unskilled medium work, noting that he was "able, on a sustained basis, to understand, remember, and carry out simple instructions, make simple work related decisions, respond appropriately to supervisors, coworkers, usual work situations and deal with changes in a routine work setting."[2]

The ALJ noted that claimant, on multiple occasions, testified he had no physical limitation that would affect his ability to work and that he was able to perform a wide range of physically demanding activities including walking his dog, riding his bike, mowing the yard, and cleaning the gutters. Instead, Herrmann alleged he was unable to work due to anxiety, depression, manic-depression, and a chemical imbalance—all manifesting in frequent panic attacks of long durations. Claimant underwent inpatient psychological treatment in November

---

[1] The ALJ concluded "[b]ased on the evidence in the record . . . the claimant's mental limitations do not result in disabling functional limitations when considered with or without the substance abuse. Therefore, the materiality of the claimant's substance abuse is not at issue, and no 'material' determination is needed." Tr. at 70. This finding is not challenged on appeal and therefore not relevant to this opinion.

[2] *See* SSR 85-15, 1985 WL 56857, at *4 ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.").

2013, when he was diagnosed with a mood disorder. However, subsequent treatment notes indicate his condition was overall stable, with a full affect, normal psychomotor activity, euthymic (normal) mood, and intact thoughts. Most significantly, Herrmann testified that since he stopped drinking and started taking his medications as prescribed his panic attacks had largely subsided. *See* Tr. 133 ("I used to have them about every—two or three times a week. Now I do good if I have one a week."). When asked how long his weekly panic attacks lasted "start to finish," he replied, "Just 20 or 30 seconds." Herrmann testified he walked "up and down the street" or "around the block or two" to calm down and curb his panic attacks.

At Step Four, the ALJ found that Herrmann could not return to his past relevant work as an electrician's assistant, which was classified as semi-skilled, and therefore exceeded his RFC. Finally at Step Five, the ALJ found that Herrmann was not disabled relying solely on the Medical-Vocational Guidelines. 20 CFR 416.969.

## ANALYSIS

1. The First Two Assignments of Error

While claimant raises three issues on appeal, the first two are either without merit or constitute harmless error. These assignments need only be addressed briefly.

Herrmann first asserts the ALJ erred in closing the hearing without asking claimant or his representative if they had any additional evidence to submit. *See* HALLEX I-2-6-78. However, claimant concedes in his brief that "there was no further medical evidence available to substantiate his complaints." Claimant has thus failed to show that he was prejudiced by the ALJ's failure to inquire as to any additional evidence. *See Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001) ("This Court requires, however, a showing that claimant was prejudiced by the

agency's failure to follow a particular rule before such a failure will be permitted to serve as the basis for relief from an ALJ's decision.").

Claimant next contends the ALJ erred in evaluating his panic attacks. He takes issue with the ALJ and his attorney not inquiring into what limitations, if any, his panic attacks inflicted on him throughout the day. Nevertheless, claimant testified succinctly that his panic attacks, which occurred *at most* once a week, lasted—*from start to finish*—approximately twenty to thirty seconds. While it is unclear whether he walked "up the street" or "around the block" to ward off further attacks or to alleviate an attack upon onset, the record supports the ALJ's findings that claimant's panic attacks were well-controlled and non-disabling. Moreover, Dr. Baymiller observed normal speech, memory, behavior, orientation, concentration, associations, thought process, mood and affect, and judgment and insight (Tr. 524).There is nothing in the record to suggest the ALJ abused his discretion in not inquiring further and/or in not ordering a mental consultative examination.

## 2. Reliance on the Medical-Vocational Guidelines

Claimant's third assignment of error is more problematic. He asserts the ALJ erred when, instead of calling a vocational expert, he relied exclusively on the Medical-Vocational guidelines (commonly called the Grids) to determine that Herrmann was not disabled. Claimant argues the ALJ's Step Two finding that Herrmann had severe nonexertional impairments precludes reliance on the Grids.[3] As discussed *infra*, there are cases that can be interpreted to hold that when a non-exertional impairment is found to be severe at Step Two, an ALJ may not rely on the Grids at

---

[3] Nonexertional impairments are those impairments that neither worsen nor improve as the level of physical exertion changes and that tend to remain the same regardless of the level of exertion. 20 C.F.R. 404.1545(d), 20 C.F.R. Pt. 404 Subpt P. App. 2 § 200. Pain can be either nonexertional, if it is neither worsened nor relieved by changing exertion levels, or if aggravated by increased exertion it can morph into an exertional limitation.

5

Step Five. The Commissioner counters that use of the Grids is not error in this case because Claimant makes no substantive claim regarding any work-related functional limitations arising from his nonexertional impairments that are supported by credible evidence. Notwithstanding the Step Two severity determination, the Commissioner argues that in this case use of the Grids was appropriate.

Where a claimant cannot return to his past work, the burden of production shifts to the Commissioner (Step Five). The Commissioner must determine claimant's residual functional capacity to perform work and whether jobs exist in the national economy that claimant can actually perform. "The first inquiry involves a determination of historic facts, and the regulations properly require the Secretary [now Commissioner] to make these findings on the basis of evidence adduced at a hearing." *Heckler v. Campbell*, 461 U.S. 458, 467 (1983). But the second inquiry involves the determination of "an issue that is not unique to each claimant—the types and numbers of jobs that exist in the national economy." *Id*. at 468. The Grids are a shorthand way of evaluating a claimant's vocational situation and are designed to eliminate the need to repetitively call vocational experts to produce the same proof regarding available jobs in those cases categorically covered by the Grid rules.

The various Medical-Vocational Guidelines lay out matrices with specific vocational profiles depending on the age, education, work experience, and residual functional capacity of a claimant. Where a claimant fits precisely within one of the profiles, the Guidelines will either deem a claimant "disabled" or "not disabled," incorporating the Commissioner's institutional knowledge of the existence of jobs in the national economy within the various exertional categories. The Grids, properly applied, streamline the decision-making process, reduce administrative costs, and provide more consistent outcomes for similar claimants.

However, the Commissioner's institutional knowledge regarding the availability of jobs is broken down in the Grids only by the broad exertional categories of sedentary, light, medium, heavy, or very heavy. Where claimant has exertional or nonexertional limitations that restrict his RFC to less than the full range of jobs in an exertional classification, the Grids are inapplicable. Where claimant cannot do the full range of work at an exertional level, the Grids are designed to provide *only* guidance and a framework for a decision, not a rule for decision, in the disability determination. When the Grids are not applicable because of *significant* exertional or non-exertional limitations, "other evidence" must be adduced by the Commissioner. In the Fifth Circuit Court of Appeals, the "other evidence" necessary to meet the Commissioner's Step-Five burden is limited to expert vocational testimony. *Fields v. Bowen*, 805 F.2d 1168, 1171 (5th Cir. 1986). Failing this proof, in cases involving *significant* nonexertional limitations, the denial of a disability claim at Step Five is not supported by substantial evidence. Therefore, because there was no expert vocational testimony in the present case, if the Grid Rules are inapplicable, this case must be remanded.

*Whether the Grid Rules Apply*

The law is clear that the mere presence of nonexertional impairments will not automatically preclude the application of the Grids. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987); *White v. Astrue*, 239 Fed. Appx. 71, *2 (5th Cir. July 9, 2007) ("The mere existence of pain does not prohibit reliance on the Grid Rules where the ALJ finds that the pain will not significantly compromise a claimant's capacity for a full range of work."); *Hearne v. Barnhart*, 111 Fed. Appx 256 (5th Cir. 2004). The law is also clear that if a claimant has a nonexertional limitation that "significantly limits" his ability to perform the full range of work at one of the exertional levels, the Medical Vocational Guidelines cannot be directly applied. *Crowley v.*

*Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) ("Use of the 'Grid Rules' is appropriate when it is established that a claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect his residual functional capacity.")

What is unclear, however, is how an ALJ should determine whether a nonexertional limitation "significantly limits" a claimant from performing a full range of work and how a reviewing court should review such a determination.

One group of cases holds that a finding at Step Two of a severe nonexertional condition or illness is the equivalent of and mandates a finding at Step Five that the claimant has a nonexertional impairment that "significantly restricts" the plaintiff's ability to perform a full range of work at an exertional level, thus precluding application of the Grids. *See Loza v. Apfel*, F.3d 378, 399 (5th Cir. 2000); *Hearne*, 111 Fed. Appx. at 257 (agreeing with plaintiff's argument that a non-exertional impairment found to be severe at Step Two precluded the ALJ from relying solely on the Grid Rules at Step Five). In this first group of cases, the Fifth Circuit imposes a *per se* rule that precludes the application of the Grid Rules if a nonexertional impairment is found to be severe at Step Two. Clearly in many—perhaps most—cases an impairment that is found to be severe at Step Two will logically lead to the decision at Step Five that the impairment significantly restricts a claimant's RFC. The question this court is considering is whether the Step Two determination logically, necessarily, and always determines the decision at Step Five and/or does the existing case law dictate this result.

A second group of cases considers the question at Step Five of "significant restriction" and looks to see if the Step Five determination is supported by substantial evidence, without necessarily referencing the Step Two severity determination. *See Watson v. Barnhart*, 288 F.3d 212, 216–17 (5th Cir. 2002); *Lawler v. Heckler*, 761 F.2d 195, n.2 (5th Cir. 1985) (directing

8

commissioner to consider whether claimant's personality disorder was a nonexertional impairment that would further restrict the number of jobs the plaintiff could perform).

In one of this second category of cases, *Fraga v. Bowen*, 810 F. 2d 1296, 1304 (5th Cir. 1987), the claimant injured his back at work and testified to having constant pain in his back and pain that waxed and waned in one of his hips. The ALJ found that Fraga suffered from disk problems in his lower back, hypertension, and low back and right leg pain, but at Step Five found that the Medical-Vocational Guidelines directed a conclusion of "not disabled." The ALJ found that Fraga could perform a full range of light work and that his nonexertional pain limitations did not prevent him from performing all substantial gainful activity, nor did it significantly compromise his RFC. *Id.* at 1301.

On appeal, Fraga argued that because his pain was a nonexertional limitation, reliance on the Grids, rather than expert vocational testimony, was error. The Fifth Circuit affirmed the use of the Grids because the ALJ found that Fraga's pain was not severe enough to significantly restrict his functional capacity and that this finding was supported by substantial evidence.

There are additional cases similar to *Fraga*—cases in which a court found a nonexertional limitation to be severe but because that nonexertional limitation did not significantly affect the claimant's ability to perform the base of jobs she was otherwise capable of performing, that decision could be affirmed. For example, in *Guillory v. Barnhart*, 129 F. Appx 873, 874 (5th Cir. 2005)(per curiam), the ALJ applied the Medical-Vocational Guidelines to find the claimant was not disabled. Guillory argued that because the ALJ found she had severe nonexertional limitations at Step Two, he could not utilize the Medical-Vocational Guidelines at Step Five. The court disagreed, however, and held:

> If those impairments do not have a significant effect on her residual functional capacity use of the Gird Rules is appropriate. The ALJ found that Guillory's

9

>  nonexertional impairment did not significantly affect her ability to perform the base of jobs she was otherwise capable of performing given her age, education and exertional limitations.

*Id.*

In *White v. Astrue,* 239 Fed. Appx 71 (5th Cir. July 9, 2007), at Step Two, the ALJ found that White had severe degenerative disease, post-traumatic back pain syndrome, cervical strain/sprain, and a meniscal tear in his left knee. However, the ALJ also found that despite its severity, the claimant's pain did not prevent him from performing a full range of light work. Consequently, because substantial evidence supported this finding, the court affirmed the ALJ's decision to use the Grid Rules and his finding that White was not disabled.

What is unclear, however, is why the court in *White* also cited *Hearne v. Barnhart* in the same decision for the proposition that "[a]n ALJ's finding of a severe non-exertional impairment at step two precludes the ALJ from relying solely on the Grid Rules at step five." *White¸* 239 Fed. Appx. at *3. It appears that is precisely what the court did in *White.* There did not appear to be an argument in *White* that his pain was not severe. The argument centered exclusively on the contention that either it prevented him from performing a full range of light work or it did not. That is, either it significantly limited his ability to perform the full range of work at one of the exertional levels or it did not. The ALJ found that it did not, and the court affirmed that decision because, despite the finding of severity at Step Two, substantial evidence supported his decision as to the limiting effect and thus using the Grid Rules was appropriate.

*The Functions and Standards Applied at Step Two and Step Five*

It bears repeating that in many cases surely the end result would be the same with or without a rule linking Step Two and Step Five determinations. But it appears to the court that there are different standards applicable for Step Two and for Step Five determinations, and that

10

these steps perform different functions within the Commissioner's five-step decisional process. The court, therefore, believes that in a limited number of cases—this case being one such example—substantial evidence may support both a finding that a nonexertional impairment is "severe" at Step Two, and that it nevertheless does not significantly restrict the claimant's RFC to perform a full range of work at an exertional level. To explain, the court looks to the different functions of these two steps in the decisional framework employed by the Commissioner.

The Commissioner's five-step process provides a sequential decision-making process to allow decision making at the earliest appropriate time. At Step Two this decision-making process provides for the elimination of the cases involving the most trivial physical or mental defects. Because this step eliminates claims based only on medical information and skips a vocational analysis, it employs a *de minimus* standard of severity. The *de minimus* nature of the standard is shown, not so much by the language of the current regulations, as it is shown by the history of the standard as set out in the predecessor regulations. While under the current regulations impairments are determined to be "severe" or "not severe," the standard originally referenced looked to see if a claimant had a "slight neurosis, slight impairment of sight or hearing or other slight abnormality or combination of abnormalities." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985). While the language was changed in the regulations, the actual standard to be used at Step Two has remained the same, as did the intent to eliminate only those claims most clearly *not* involving disability. *Id.* at 1102-1103. ("The prevailing idea … is that some impairments are so slight that the ability of the claimant to work can be decided without a full evaluation of vocational factors. The fact finders are entitled to follow a sequential process that disposes of those cases at the early stage.") (quoting H.R. 3755, 98th Cong., 2d Sess., 130 Cong. Rec. 9821–39 (1984)). Any doubt as to whether this showing has been made is to be resolved in favor of the

applicant. *Newell v. Commissioner of Social Security,* 347 F.3d 541 (3rd Cir. 2003). In short, "[t]he step-two inquiry is a *de minimis* screening device to dispose of groundless claims." *Id.* at 546.

In the Fifth Circuit, the standard enunciated by the *Stone* court is "[A]n impairment can be considered as *not* severe only if it is a slight abnormality [having] such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Stone*, 752 F.2d at 1102 (emphasis added). It is significant that the definition is in the negative, signifying the minimal showing needed to proceed further in the decision-making process. It is not an individualized analysis of the impact of the claimant's impairment on the claimant's ability to perform work functions.

Therefore, Step Two functions as an early screening to identify and eliminate the frivolous. It functions as a "pass/fail" system, rather than attempting meaningful evaluation of an impairment in any common-sense meaning of the word "severe." Thus, a finding of "severity" at Step Two functions to adjudicate that the claim is not baseless, frivolous, or otherwise clearly lacking in merit.

At Step Three, the decision-making matrix is designed to perform the inverse of Step Two—the identification and adjudication of those with such severe levels of impairment that they may be deemed disabled without vocational evaluation. The Listing of Impairments catalogs and defines a wide range of impairments, and where the medical and other proof precisely meet the criteria of a Listing, the claimant is deemed disabled. *Mershel v Heckler*, 577 F. Supp. 1400, 1405, n.15 (S.D.N.Y. 1984) ("The Listing of Impairments … does not provide the exclusive definition of disability under the Act; it provides only a catalogue of 'automatic'

disabilities.")  At Step Four, the claimant's residual functional capacity is assessed and the ALJ decides whether a claimant's capacities allow a return to any past relevant work.

At the final step, if a claimant is unable to return to past work, the Commissioner must look at the claimant's residual functional capacity and make a vocational determination as to whether there are jobs available the claimant can perform, either by application of the Grid Rules or by taking expert vocational testimony. When considering the impact of nonexertional impairments, the Grids will apply so long as those impairments do not "significantly interfere" with the claimant's ability to perform a full range of work at an exertional level. *Loza,* 219 F.3d at 399. Thus the Step Five decision is based upon a fully developed record and considers all evidence in the case and all factors that may impact a claimant's ability to work: objective medical proof, subjective complaints, lay testimony, and typically detailed function-by-function reports assessing the claimant's capacities and limitations by treating or other examining physicians. Therefore, Step Five, unlike Step Two, does not function as a screening process.

Additionally, the standard for Step Two determinations of severity of impairments is facially different from the announced standard for weighing whether nonexertional impairments will preclude application of the Grid Rules at Step Five. The first standard holds that any slight impairment that may impact any claimant's ability to work regardless of age, education, or work experience must be deemed severe. *Stone*, 752 F.2d at 1101. That is not the same thing as the individualized determination that should be made at Step Five where the ALJ must determine if a nonexertional impairment will significantly restrict that particular claimant's RFC to perform a full range of work at an exertional level. It appears to the court that with both differing functions and standards at these two steps that some claimants may have nonexertional impairments that

meet the Step Two *de minimus* standard, but that nevertheless do not significantly limit a claimant's RFC at Step Five.

Turning to the present case, Herrmann testified he had no physical limitations that would affect his ability to work, but that his anxiety and panic attacks led him to alcohol abuse, which together prevented him from working. However, he further testified that he had stopped drinking and that he had found other ways to combat his panic attacks—to the point he experienced them once a week (at most) and that they lasted only twenty to thirty seconds. Instead of drinking, he took up gardening, walking, and riding his bicycle. Claimant claimed memory problems as well as trouble completing tasks, concentrating, understanding, and following instructions. But Dr. Baymiller observed normal speech, memory, behavior, orientation, concentration, associations, thought process, mood and affect, and judgement and insight. On multiple occasions, Dr. Baymiller reported normal psychiatric findings and claimant stated he was "doing well," his mood was "generally good," and he believed his treatment had helped "very much." Substantial evidence therefore supports the ALJ's finding.

The court does not see any evidence, not expressly rejected by the ALJ, to support any significant functional restrictions arising from Herrmann's mood disorder that would restrict claimant from performing the full range of unskilled work at the medium level.[4] Nor has claimant suggested how his mood disorder results in any functional limitations.

---

[4] Consistent with claimant's RFC,

> The functional capacity to perform medium work includes the functional capacity to perform sedentary, light, and medium work. Approximately 2,500 separate sedentary, light, and medium occupations can be identified, each occupation representing numerous jobs in the national economy which do not require skills or previous experience . . . . The functional capacity to perform medium work represents such substantial work capability at even the unskilled level that a finding

14

## CONCLUSION

The court finds the ALJ's RFC determination is supported by substantial evidence. Because Herrmann was found to be able to perform a full range of unskilled medium work, application of the Grid Rules in this particular case was not error. The decision of the Commissioner shall be affirmed. A separate judgment shall issue.

This the 27th day of July, 2018.

/s/ David A. Sanders
UNITED STATES MAGISTRATE JUDGE

---

of disabled is ordinarily not warranted in cases where a severely impaired person retains the functional capacity to perform medium work.

20 C.F.R. Pt 404 Subpt P. App. 2 § 203.